

U.S. Department of Justice

*United States Attorney
Southern District of New York*

*The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278*

August 15, 2025

**VIA ECF AND EMAIL**
The Honorable Arun Subramanian
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    <u>United States v. Boateng et al.</u>, 23 Cr. 263 (AS)

Dear Judge Subramanian:

    The Government respectfully submits this letter in opposition to the motions for pretrial release made by defendant Isaac Oduro Boateng on August 11, 2025, Dkt. 13, and by defendant Derrick Van Yeboah on August 13, 2025, Dkt. 17.[1]

    The defendants should remain detained, as no condition or combination of conditions can adequately ensure that they will appear in court or protect the safety of the community. The defendants were recently extradited from Ghana and have no ties to the United States. They are facing a high likelihood of conviction and massive sentencing exposure. As a result, if released, they have every incentive to flee rather than face the charges against them. Moreover, the defendants have made clear their willingness to pay bribes or pursue other corrupt avenues to evade justice. The Court should therefore do what courts virtually always do in the case of extradited defendants and order them detained.

**I.    Background**

    On May 30, 2023, a grand jury in this district returned a sealed indictment charging Boateng, Van Yeboah, and two other defendants with participating in a large-scale scheme to defraud individual victims by romance scams and corporate victims by business email compromise scams. In total, the conspiracy stole and laundered more than $100 million from dozens of victims. As described further below, Boateng and Van Yeboah were leaders of the scheme and played an integral role in the harm caused to victims.

    In the romance scams, members of the conspiracy deceived vulnerable older individuals into believing that they were in romantic relationships with people who were, in fact, fake identities assumed by members of the conspiracy. Once members of the conspiracy had gained the trust of

---

[1] The Government respectfully requests permission to redact certain portions of this memorandum to protect the identity of individuals who made statements to law enforcement.

victims using the fake identity, they convinced the victims, under false pretenses, to transfer money to bank accounts the victims believed were controlled by their romantic interests, when in fact the bank accounts were controlled by members of the conspiracy. At times, the members of the conspiracy also persuaded victims, under false pretenses, to receive funds in the victims' bank accounts, which, unbeknownst to the victims, were fraud proceeds, and to transfer those funds to accounts under the control of members of the conspiracy.

In the business email compromise schemes, members of the conspiracy created fake email accounts to impersonate employees of victim companies or their counterparties. These fake email accounts were specifically designed to trick other employees of the company with access to the company's finances into thinking the fake email accounts were authentic. The fake email accounts were then used to send instructions to wire money to certain bank accounts and also included fake authorization letters for the wire transfers that contained forged signatures of company employees.

Boateng and Van Yeboah are charged with participating in the conspiracy from 2016 until the date of the indictment, in May 2023, although the conduct has likely continued into the present. They are both charged in five counts: (1) conspiracy to commit wire fraud; (2) wire fraud; (3) conspiracy to commit money laundering; (4) conspiracy to receive stolen money; and (5) receipt of stolen money.

The defendants were arrested in Ghana on June 13, 2025 and detained there. On August 7, 2025, they were extradited to the United States. They were presented before United States Magistrate Judge Robert W. Lehrburger the next day and ordered detained on consent, without prejudice to future applications.

### II.     The Defendants' Motions

Boateng's bail motion proposes that he reside at the home of a friend, Eric Owusu, who he says will sign a bond on his behalf. Boateng does not offer any additional cosigners, does not propose any restrictions on his movement such as home detention, and does not identify a bond amount.

Van Yeboah's bail motion proposes that he lease an apartment in New York and be subject to location monitoring; and sign a $500,000 bond cosigned by three individuals.

Neither defendant proposes a cash bond or any other security.

### III.    Applicable Law

A district court must detain a defendant pending trial if, "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). The Government bears the "burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community, and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *United States* v. *English*, 629 F.3d 311, 319 (2d Cir. 2011) (quotations and citation omitted).

In considering applications for bail, courts consider the following factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves . . . a controlled substance [or] firearm . . .; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including-- (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## IV. Discussion

The defendants—who were extradited from Ghana and have no ties to the United States—have every incentive to flee. They also operated a sophisticated fraud scheme for years that harmed dozens of victims, and constitute an unacceptable danger to the community if released. They should remain detained.[2]

### A. The Defendants Have Every Incentive to Flee

The defendants' incentives are a critical factor to consider. If convicted, the statutory maximum they face on the five counts combined is 75 years. The sentencing exposure if convicted at trial—while still being investigated and calculated by the Government—is astronomical and may be the statutory maximum of 75 years, due to, among other things, the enormous loss amount and their aggravating role in the scheme.[3]

---

[2] The defendants were paroled into the country for the sole purpose of facing criminal charges in the instant case. However, the Government understands that the defendants have detainers from Immigration & Customs Enforcement ("ICE"). If the defendants are ordered released, the Government understands that ICE may enforce those detainers and detain the defendants.

[3] For example, the following calculation would result in an offense level past the top of the sentencing chart: **(1)** base offense level of seven, U.S.S.G. § 2B1.1(a)(1); **(2)** plus 24 levels for a loss of more than $65 million, U.S.S.G. § 2B1.1(b)(1)(M); **(3)** plus four levels because the offense resulted in substantial financial hardship to five or more victims, § 2B1.1(b)(2)(B); **(4)** plus two levels because a substantial part of a fraudulent scheme was committed from outside the United States, U.S.S.G. § 2B1.1(b)(10); **(5)** plus two levels because the money laundering Guideline is based on the fraud Guideline and the defendants will be convicted under 18 U.S.C. § 1956,

The defendants are further aware that judges have imposed heavy sentences on other members of the conspiracy, including those who had far lesser roles in the criminal activity. Fred Asante, for example, was a U.S.-based money-laundering leader of the conspiracy, and Judge Rakoff sentenced him to a nine-year term of imprisonment even after a guilty plea. *United States v. Asante*, 21 Cr. 88 (JSR). In *United States v. Rufai*, 18 Cr. 201, Judge Cote imposed prison terms of 70 months, 51 months, 48 months, and 39 months on U.S.-based money launderers who are far less culpable than any of the four defendants charged in the present indictment.

As described below, the evidence against the defendants is strong. It is highly likely that the defendants will be convicted and then serve substantial sentences.

If given the opportunity, why would the defendants face the near certainty of a lengthy prison sentence rather than flee? They are not American citizens. They do not live in the United States and have never lived in the United States. They do not have jobs in the United States. They do not have children, spouses, parents, or siblings in the United States. Their ties, understandably, are to Ghana, where they have lived their entire lives, and where they would surely prefer to reside.

### B. The Defendants Have the Assets and Ability to Flee

In addition to their incentives to flee, the defendants are wealthy and well-connected, which provides them with the ability to easily flee the United States if released.

Boateng's bail motion says that he and his wife have sole control of a business with 300 employees. Dkt. 13-1 at 1-3. He told Pretrial Services that his business was worth $5 million, and that he owned properties and bank accounts worth $1.5 million. When he was arrested, Ghanaian law enforcement found him in possession of a Porsche 911 that had been stolen from the United States, as well as an Audi, a Landcruiser, a Mercedes G-Wagon, and a Range Rover.

Van Yeboah told Pretrial Services that he has a combined monthly income between him and his wife of only $6,500, but that he owned $515,000 in jewelry, a $130,000 Mercedes, a $150,000 Lexus, and a home worth $1.5 million. When Van Yeboah was arrested, Ghanian law enforcement determined that the Mercedes in his possession had been stolen from the United States, the Lexus had been stolen from Canada, and that he also owned a Toyota Tundra. The disparity between those income numbers and his assets makes clear that he has substantial fraud earnings and also indicates a high likelihood that Van Yeboah was not entirely truthful to Pretrial Services about the amount and source of his income and wealth. That in itself is an important consideration for this Court, as any pretrial release relies upon largely voluntary compliance with the rules set by Pretrial Services.

These assets, worth millions, are the proceeds of the massive fraud scheme charged in the indictment. Nor is there any indication that Ghanaian authorities were able to seize ***all*** the assets

---

U.S.S.G. § 2S1.1(b)(2)(B); **(6)** plus two levels because the offense involved sophisticated laundering, U.S.S.G. § 2B1.1(b)(3); and **(7)** plus three or four levels for an aggravating role in criminal activity that involved five or more participants, U.S.S.G. § 3B1.1.

4

belonging to the defendants. After all, the defendants and their coconspirators used a sophisticated international web of money launderers and were adept at concealing the source and destination of funds. The defendants may have squirrelled away funds with other conspirators or in other countries to both enable them to flee if given the opportunity and to protect assets from seizure after conviction.

The defendants' fraud scheme also relied on deception and impersonation. The conspirators—and Van Yeboah personally—successfully impersonated romantic partners to individual victims as part of their romance scams, and other conspirators successfully impersonated corporate employees as part of their business email compromises. Those same skills of deception and impersonation could be used to facilitate flight from the United States.

The conspiracy the defendants participated in was extensive, and conspirators were active in the United States, Ghana, and other countries. The defendants—who were leaders of that conspiracy—would be able to take advantage of that conspirator network to facilitate their flight. U.S.-based members of the conspiracy could help smuggle them out of the country, and they would be able to escape either back to Ghana or to other countries that might be more difficult to extradite from.

These are not hypothetical concerns. 

### C. The Defendants Are a Danger to the Community

The allegations in this case are extremely serious. The nature and circumstances of the charged offenses make clear that they are a danger to the community if released. 18 U.S.C. § 3142(e)(1).

The defendants took advantage of vulnerable, lonely individual victims. They tricked those victims into believing that they had found love—that they had found romantic partners to spend time with. That was a lie. The defendants used those victims, draining their funds and using them to open bank accounts to launder even more money. Victims were left financially devastated, emotionally shattered, and humiliated that they had fallen for such a scheme. Some of the victim impact statements submitted in a previous sentencing in this case are below, which show the incredible harm these defendants and their co-conspirators perpetrated on their victims:[4]

- "Mark [the online identity impersonated by a member of the conspiracy] begged me to sell my home. I have many loving emails from him. He took such advantage of me . . . It was

---

[4] See *United States v. Asante*, 21 Cr. 88, Dkt. 111 at 5-6.

the wors[t] thing that ever happened to me." "I already drained my children's inheritance . . . and my bank accounts." "This man had not only taken $350,000 in cash which is an estimate. He ruined my credit. I was unable to grieve my mother's death. I have kept secrets from my children. I had to rebuild my life all over again at a very older age. It's very hard for me to trust. I don't answer calls unless it's family. I will never touch the computer again."

- "I am writing this in regards to the sentencing of the schemers who took advantage of my mother at her most vulnerable time and effectively broke up my family . . . After a year of grieving [her husband's death] my mom decided to join a dating app. She had never dated any man other than my father, as she got with him when she was only 15 years old, and had no idea how evil the world could be . . . [My mother] decided she needed to go back to work since sending this man 25k of the only money she had left to retire on at 58 years old. Our family has been split apart and I don't foresee it ever being made whole . . . My mom has never returned to the dating world since this happened, she has been traumatized by this nightmare. I do not want my mother to grow old alone but there is a chance that will be her fate."

- "Mr. Asante and the group of people that worked with him have defrauded me out of over $125,000. This greatly affected my financial situation . . . I had to sell my dream house that I worked extremely hard for . . . The emotional impact has been extreme humiliation that this has happened and that I was lied to for so long. . . . I've lost trust in people in general. The stress of having to pay back all that money has been unbearable . . . I wish I could feel normal again."

- "Prior to this scam, I was a very trusting person, but now I am le[e]ry of everyone. I was very depressed and upset that I let him take advantage of me and my good nature. It took a toll on me mentally for many months and even to this day when I think back on it. Financially, I was on the road to retirement having worked very hard for many years. This scam has forced me to work longer to rebuild my finances."

Boateng was a leader of the conspiracy, and one of the individuals responsible for directing all this suffering. Van Yeboah was directly interacting with victims, personally deceiving and defrauding them on a daily basis. The conspiracy went on for years, and it generated substantial wealth for both defendants.

In addition, Van Yeboah was arrested in possession of several firearms, a photograph of which is below:



The nature and circumstances of the offense require detention, and illustrate why the defendants would be a danger to the community if released. This is a crime that the defendants committed using computers, and, especially as to Boateng, much of his conduct was directing the activity of others. That activity could easily continue if the defendants were released on conditions, no matter how stringent those conditions would be.

### D. The Evidence Against the Defendants is Strong

The evidence against Boateng and Van Yeboah is overwhelming. Both defendants appear to incorrectly assume that the information in the extradition affidavits constitutes the sole evidence against them. Boateng Motion at 2 ("The origin of this indictment is related entirely to Mr. Boateng's unfortunate but not illegal business relationship with Fred Asante."); Van Yeboah Motion at 8 ("the evidence cited in a related affidavit is remarkably thin"). That is incorrect. The Government expects to put on substantial evidence in the form of victim testimony, financial records, messages between conspirators, and the testimony of cooperating witnesses. Some of that evidence is described below.

But the Government's case has become even stronger since the arrest of the defendants. Both defendants were found in possession of substantial assets, demonstrating their wealth from the fraud. Both were found in possession of expensive cars that had been stolen from the United States. And electronic devices were seized from the defendants,[5] which the Government intends to obtain warrants for and expects will contain substantial additional evidence of the defendants' commission of the crime.

---

[5] The Government is in possession of devices belonging to Van Yeboah and expects Ghana to send devices belonging to Boateng shortly.

7

With respect to the defendants' roles as to specific victims, the Government expects the evidence to show the following:

1. **Victim-1 and Victim-2**

An Illinois woman ("Victim-1") was tricked by the conspirators into believing that she was in a romantic relationship with a fake individual who was in fact a member of the conspiracy. At the direction of the conspirator, under his assumed identity, Victim-1 opened U.S. bank accounts and sent and received money. One of Victim-1's bank accounts received $145,000 from a Connecticut multinational company ("Victim-2") that was deceived by a business email compromise scheme and believed it was paying an invoice owed to a counterparty. After Victim-1 received the fraud money from Victim-2, she, at the direction of the fraudsters, transferred $49,800 of it to a company controlled by convicted coconspirator Fred Asante. On June 9, 2020, Boateng messaged Asante a picture of the $49,800 cashier's check from Victim-1's company to Asante's company, along with a picture of the mailing label to Asante's company.[6]

In other words, Boateng sent Asante a picture of a transaction that was going from a victim to Asante. He sent the picture even before Asante received the check—that is why he sent a picture of the mailing label. The picture must therefore have been taken by Victim-2. Victim-2 presumably took the picture to show her fake romantic partner that she was complying with his request. The only logical inferences are that either Boateng was directly communicating with Victim-2 as part of the fraud, or that Boateng was directing other conspirators who were directly communicating with Victim-2. Either way, Boateng was a knowing participant in the fraud scheme, but the Government expects to introduce evidence at trial that Boateng's role was typically supervisory.

2. **Victim-3**

A woman ("Victim-3") was tricked by the conspirators into believing that she was in a romantic relationship with a fake individual who was in fact a member of the conspiracy. At the direction of the conspirator, under his assumed identity, Victim-3 opened U.S. bank accounts and sent and received money.

Van Yeboah personally operated the fake persona that deceived Victim-3. And communications between Asante and Patrick Kwame Asare, a/k/a "Borgar"—the unapprehended fourth defendant in the case— confirm Van Yeboah's involvement in scamming Victim-3 and defrauding her into transferring money. Below are a set of those communications. In these messages, Asante and Asare—two members of the conspiracy—are discussing the transfer of money by Victim-3. They discuss what "cut" of the stolen money various conspirators will receive, and Asante and Asare agree that Van

---

[6] The texts with Asante described in this letter were obtained from a judicially authorized search warrant of Asante's cellphone.

8

Yeboah—through his company Vanscope Real Estate—will receive 96,300 in Ghanaian currency. Van Yeboah received that cut because he was the man behind the keyboard deceiving Victim-3.

Boateng also had a key supervisory role in the fraud against Victim-3. On July 15, 2020, Victim-3's company sent Asante's company $52,000, and two weeks later, her company sent Asante's company $28,000. In each case, Boateng sent Asante wire confirmations for the transactions to Asante. As with Victim-2, the only reason Boateng would have had information about these transactions to send to Asante because he was directing the romance scams, and was able to determine which of the conspiracy's money launderers would help him launder the money back to Ghana, where it would remain under his personal control.

### 3. Victim-4

An Ohio woman ("Victim-4") was tricked by the conspirators into believing that she was in a romantic relationship with a fake individual who was in fact a member of the conspiracy. At the direction of that conspirator, under his assumed identity, Victim-4 opened U.S. bank accounts and sent and received money.

Van Yeboah personally operated the fake persona that deceived Victim-4.

Messages between Asante and another member of the conspiracy ("CC-1") also make clear Van Yeboah's role in defrauding Victim-4. In these messages, CC-1 and Asante discussed how Victim-4 needs to contact her bank to get certain fraud funds unfrozen so that they can be transferred to the conspirators. They expect that their advice will be passed on to Van Yeboah, who in turn will tell Victim-4 how to convince the bank to unfreeze the funds:

- At the beginning of the messages, Asante says that Victim-4 should tell the bank, "her and her husband buy frozen foods and cars from me most of their business is base develop in Ghana .. that's why her company send me all the time .. I buy for them as trader." This is the fake story that the conspirators propose Victim-4 use with the bank, and, notably, Boateng uses the same fake story about "frozen foods" to justify his huge fraud profits.

- Slightly later in the messages, Asante says that "Guy will ask a lot of questions so she needs to be ready and prepared to talk well." Here he means the bank employee, who will likely question why Victim-4 wants to send the wires that the fraudsters have tricked her into sending.

- Asante then writes, "Please there's a lot of money stuck there including Kofi's." Here he means that Boateng, a/k/a "Kofi Boat," owns and controls the fraud proceeds from Victim-4, and Victim-4 needs to unfreeze her accounts so Boateng can obtain the fraud proceeds.

- Later, CC-1 writes, "Van said this guy is very very stupid he dey ask stupid questions." CC-1 is referring to the bank employee who has been questioning Victim-4 about her transactions. Van Yeboah is the source of their information about that questioning because

9

Victim-4 directly told Van Yeboah—the person behind the fake persona—about that questioning.

Boateng was also involved in the fraud against Victim-4. On June 16, 2020, Victim-4's company sent Asante's company $36,000; on June 30, her company sent his company $27,000; on July 2, 2020, her company sent his company $34,200; and on July 15, 2020, her company sent his company $52,000. Each time, Boateng messaged a picture of the wire confirmation to Asante. As with Victim-2 and Victim-3, the only reason Boateng would have had information about these transactions to send to Asante because he was directing the romance scams, and was able to determine which of the conspiracy's money launderers would help him launder the money back to Ghana, where it would remain under his personal control

### 4. Additional Evidence

Boateng's motion states that, "it is impossible for Mr. Boateng to know if or whether Mr. Asante was engaged in any illegal activities." Mot. at 2. That is plainly incorrect, as shown by texts between Boateng and Asante. In the first set of exemplar messages below, Boateng asks Asante to confirm that an Apple Bank account in the U.S. that Asante used to launder money had been shut down for fraud. Asante says that this is true, and that his lower-level money launderers are not doing a good job ("this boys are messing me up"). He complains that his bank accounts are still being closed even though he is no longer laundering money through China.

| Date | From | To | Message |
| --- | --- | --- | --- |
| 8/16/2020 | Boateng | Asante | They closed your Apple? |
| 8/16/2020 | Asante | Boateng | Capo<br>We going to have to do direct checks to Chris from on |
| 8/16/2020 | Asante | Boateng | This boys are messing me up |
| 8/16/2020 | Asante | Boateng | Am not doing China no more n still this crap |

In the next set of messages, Boateng is again asking about the status of a U.S. bank account that had been frozen. Asante explains that the account was unfrozen, and that Asante had then quickly taken the opportunity to empty the account of funds before the fraud could be detected. Asante and Boateng then discussed the possibility of paying bribes to unfreeze accounts and/or evade detection by law enforcement.

| Date | From | To | Message |
| --- | --- | --- | --- |
| 9/1/2020 | Boateng | Asante | They released the money? |
| 9/1/2020 | Boateng | Asante | You paid this to them? |
| 9/1/2020 | Asante | Boateng | Money they released long time which I cleaned out account |
| 9/1/2020 | Asante | Boateng | I told them give me 30 days<br>I don't have |
| 9/1/2020 | Boateng | Asante | Bribe or to the government |

A final set of messages provides another example of Boateng's knowledge of Asante's criminal activities. As the indictment explains, members of the conspiracy referred to their fraudulent activity as "sakawa," a Ghanaian term that refers to internet fraud.[7] Boateng is here celebrating the success of his "sakawa" with Asante, meaning the success of the fraud schemes and the laundering of those proceeds.

| Date | From | To | Message |
|---|---|---|---|
| 1/5/2021 | Boateng | Asante | Sakawa life |
| 1/5/2021 | Asante | Boateng | Yes |

As to Van Yeboah, ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. As an example, in one of those recordings, Inusah Ahmed (the third arrested defendant) explains that Van Yeboah was also working with Asante, and that one of Van Yeboah's female romance scam victims had recently been arrested after sending $7 million in fraud proceeds to Asante.

### E. The Recommendations of Pretrial Services Do Not Adequately Capture the Factors in the Bail Reform Act

While the Pretrial Services Office ("Pretrial") has recommended that the defendants be released on conditions, Pretrial's recommendation does not consider several of the factors that weigh most heavily in favor of detention. Nor does the recommendation consider all the factors mandated by the Bail Reform Act.[8] Specifically, Pretrial *does not consider*, in any way:

1. The underlying facts or circumstances of the charged offense conduct, including any information that could be proffered by the Government or case agent, or even the details alleged in the indictment, regardless of that information's reliability. See 18 U.S.C. § 3142(g)(1), (4).

2. The weight of the evidence, even if it is clear from the face of the charging document or undisputed. See 18 U.S.C. § 3142(g)(2).

---

[7] ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

[8] The Government understands that Pretrial's approach to bail recommendations is consistent with policies promulgated by the Administrative Office of the United States Courts, and that Pretrial may favor this approach for institutional and/or resource-based reasons. The Government also recognizes Pretrial's time and diligence in preparing Pretrial Reports, including the collection of information relating to the defendant's background. The Court's decision, however, under the Bail Reform Act must be informed by a broader set of information and factors—several of which are material here as explained further below.

3. The potential penalties the defendant faces if convicted, including the Sentencing Guidelines, even when they create an incentive for the defendant to flee or otherwise not to appear for future court proceedings.

4. The underlying facts or circumstances of the defendant's past conduct and/or prior crimes, even if they resulted in convictions. *See* 18 U.S.C. § 3142(g)(3)(A).

Pretrial's recommendation is instead based almost entirely on the defendant's personal history and characteristics, *see* § 3142(g)(3), most of which typically favor the defendant's request for release, especially because they are often self-reported by the defendant and corroborated, if at all, by the defendant's own family members.

The Court, however, is statutorily required to consider **all** the additional factors that Pretrial omits from its analysis, including the facts and circumstances of the crimes, the weight of the evidence against the defendants, and the penalties the defendants face if convicted, which, as described above, all strongly favor detention.

In addition, as noted above, the Government has a serious concern that Van Yeboah has not been fully candid with Pretrial Services, even about his own income. This apparent lack of candor with Pretrial is extremely troubling given the nature of the offense and indicates a disregard for Pretrial's role and a commitment to transparency with Pretrial. Honesty to Pretrial, and adherence to rules set by Pretrial, is a bare minimum for release. In addition to the other factors which strongly indicate a risk of flight, the defendants should not receive the benefit of Pretrial's recommendation when it is evident that they did not truthfully disclose all material facts to Pretrial.

### F. Defense Arguments for Release are Incorrect

Boateng argues that the fact that he has a line of credit from a bank means that he could not be involved in illegal activity. Mot. at 1. That is plainly wrong—even many criminals in the United States are able to obtain credit from banks. He argues that he will not flee because the Ghanaian government is managing his assets. Mot. at 2. But all those assets will certainly be seized when he is convicted, and, as described above, he likely has hidden assets elsewhere. He argues that the indictment does not allege that he "participated in the underlying fraud that is alleged to be romance fraud and spoof emails intended to induce fraudulent payments." Mot. at 2. That isn't true: he is charged with wire fraud and conspiracy to commit wire fraud. He argues that foreign nationals don't flee because most warrants executed by the U.S. Marshals Service ("U.S.M.S.") are not warrants for foreign nationals. Mot. at 3. The argument is nonsensical: U.S.M.S.'s primary job is making arrests in the United States, not abroad, where most extradited defendants flee and where the United States typically has no jurisdiction; the vast majority of all criminal cases do not involve extraditions; and even the link to which the defendant cites refers to individuals ***in the United States wanted by foreign nations***, not foreign defendants wanted by the United States.

Van Yeboah puts great weight on the letters by his friends and family in Ghana about his character. Mot. at 9-14 and exhibits. But those letters only emphasize his incentive to flee in this case. For example, one letter writer states that, "If released on bond, he will strictly adhere to all

court requirements while continuing to fulfill his responsibilities as a father, friend, and community member. His absence would be profoundly felt, particularly by his children who rely on his steady guidance and unconditional love." Ex. C. Those sentiments demonstrate why he should be detained, not why he should be released. He cannot "fulfill his responsibilities as a father, friend, and community member" to his community in Ghana while on bail in the United States, but he could if he were to flee back to Ghana. And, while the sentiments about his children are sympathetic, they support the reasonable conclusion that Van Yeboah may seek to care for his children by fleeing back to Ghana, rather than to remain in the United States and face a lengthy prison sentence.[9]

Van Yeboah also cites a list of six defendants who were extradited and released on bail in the last 35 years in the Southern or Eastern Districts of New York.[10] Mot. at 14-16. The fact that the defendant needs to go back 35 years to create a cherry-picked list of six individuals who were bailed under these circumstances illustrates the simple truth that the vast majority of extradited defendants are detained. It is also significant that in each of the six cases Van Yeboah cites, the defendant put up between $1 million and $20 million in actual assets to ensure their appearance, in addition to the large face value of the personal recognizance bond. Mot. at 14-16. Here, however, the defendant proposes to put up no cash, property, or any assets whatsoever. He proposes to sign a personal recognizance bond of $500,000, which will be worthless if he flees abroad, where all his assets are located. He proposes that he will have three cosigners who are financially responsible people, but he has not identified any of those individuals to the Government, and the Government is skeptical that three individuals who have at least half a million in assets would be willing to sign such a bond on Van Yeboah's behalf.

As a more representative sample, the Government has identified 14 other defendants who have been extradited to face charges in the Southern District of New York this calendar year, and every one of them has been detained.[11] The reasons for that outcome are obvious. In the vast majority of cases, as here, an extradited defendant's contacts with the United States are minimal and their incentives to flee are overwhelming, which is why courts routinely detain them.

Here, those considerations carry particular weight. Indeed, neither defendant has any connections to the United States (aside from their involvement in the instant federal case), and

---

[9] That is particularly true since Van Yeboah's own proposed conditions include "no use of the internet or cellular phones," Mot. at 3, and because he would be unable to work in the United States, meaning that he would neither be able to communicate with nor financially support his children if released on conditions.

[10] The motion at several other points discusses cases where extradited defendants were bailed, Mot. at 2-3 and 8, but in each and every case it is referring to one of those six cases.

[11] *See United States v. Bada*, 20 Cr. 03 (KPF), *United States v. Diogenes*, 22 Cr. 632 (AKH), *United States v. Fernandez-Rodriguez*, 24 Cr. 231 (KMK), *United States v. Pierre*, 23 Cr. 125 (JPO), *United States v. Furniel Vasquez*, 22 Cr. 648 (JGK), *United states v. Slupinski*, 20 Cr. 472 (MKV), *United States v. Nunez Diaz*, 24 Cr. 498 (JAV) (four defendants), *United States v. Shamosh*, 24 Cr. 27 (LTS), *United States v. Para Machado*, 19 Cr. 463 (DLC), *United States v. Amachukwu*, 23 Cr. 364 (PGG), *United States v. Arias Caceres*, 24 Cr. 659 (GHW).

they were permitted entry into the United States for the sole purpose of facing serious criminal charges. Further, the defendants have demonstrated their ability to perpetrate complex fraud schemes, including, through the creation of fake online personas and, in the case of Boateng, through acts of bribery. Given the seriousness of the defendants' charges, coupled with the extensive fraud networks and financial resources at their disposal, and their lack of status in the United States, there is zero incentive for the defendants to remain in the United States to await what is likely to be a conviction and prison sentence, particularly when they lead an extremely affluent lifestyle in their home country. Indeed, the risk of flight is not theoretical. At least one defendant in the Government's investigation—who had greater contacts to the United States and far fewer resources than these defendants—successfully fled to Ghana prior to sentencing, resulting in a lengthy process of relocation and extradition. *See United States v. Rufai*, 19 Cr. 409 (DLC). Moreover, the defendants' direction of a complex fraud scheme—which has had devastating impact on numerous U.S. victims over a period of years—poses a real risk to the community, including to their domestic victims. Accordingly, there are no conditions or combination of conditions that can reasonably assure the defendants' appearance in Court or the safety of the community. The defendants should be detained.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: */s/ Kevin Mead*
    Kevin Mead
    Mitzi Steiner
    Assistant United States Attorneys
    (212) 637-2211/2284

cc: Counsel of Record (by ECF)